## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| METRO HOSPITALITY PARTNERS, LTD | § | |
| d/b/a CROWNE PLAZA HOTEL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-11-3569 |
| | § | |
| LEXINGTON INSURANCE COMPANY, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM AND OPINION

Metro Hospitality Partners, LTD owns and operates a Crowne Plaza Hotel located near the Astrodome in Houston, Texas. In August 2010, one of the hotel's air-conditioning chillers broke down. The hotel remained open while a temporary operational chiller, then a long-term replacement unit, were installed. Nine months after the chiller breakdown, and eight months after the replacement was installed, Metro submitted a $600,000 claim supported by invoices for the replacement costs and some internal hotel labor related to the replacement work. Those invoices totaled $115,077.93. The insurer, Lexington Insurance Company, promptly paid the invoices Metro submitted, less the deductible, for a total of $90,077.93. Although Metro had demanded far more, it had neither specified the added losses nor submitted documents supporting them.

Metro took the money but advised Lexington that it did not accept the $90,077.93 payment as fully satisfying the claim. Metro then filed this suit, alleging breach of the insurance contract and unfair settlement practices under the Texas Insurance Code. After removal, Metro filed an amended complaint that for the first time asserted a business-interruption loss claim. Metro's counsel has acknowledged that the only issue in the litigation is the business-interruption loss claim and damages.

Lexington has moved for summary judgment, arguing that Metro lacks evidence to support the business-interruption losses and damages it claims and that the causes of action fail as a matter of law.  (Docket Entry No. 78).  Metro responded, and Lexington replied.  (Docket Entry Nos. 80, 82).  The court held a hearing and counsel presented argument on the motion.

Based on the motion, the briefs, the arguments, the pleadings, the record, and the applicable law, the court grants Lexington's motion for summary judgment.  Final judgment is separately entered.  The reasons are explained below.

I.      **Background**

Lexington issued Metro a commercial-property insurance policy effective from December 2009 to December 2010.  (Docket Entry No. 79-1, at 57).  Lexington, in turn, had an equipment-breakdown reinsurance policy issued by The Hartford Steam Boiler Inspection and Insurance Company ("HSB").  As Lexington's equipment-breakdown reinsurer on Metro's policy, HSB was responsible for investigating and determining coverage for claims involving the hotel's boiler machinery.

On August 20, 2010, Metro contacted HSB to report the August 15 chiller breakdown. Metro told HSB's claims manager that the chiller had malfunctioned, reported that some customers had left, cutting their reservations short, and expressed concern about a big event scheduled for the next weekend. (Docket Entry No. 80-2, at 13).  There is no indication of later reports from Metro about customers or event planners cancelling reservations until after this suit was filed.

Metro reported the chiller breakdown to its insurance agent at Lexington on August 23.  Two days later, on August 25, Metro signed an agreement with an engineering company to replace the chiller by September 20.  Neither HSB nor Lexington received a copy of that agreement until after Metro filed this suit.

On September 3, 2010—19 days after the loss and 14 days after Metro reported it to Lexington—Metro sent HSB a repair estimate.  HSB promptly responded, accepting liability for the property loss and asking Metro for repair or replacement quotes, invoices, and contracts.  Despite HSB's repeated follow-up inquiries, Metro did not respond with the requested documents or information for nine months.  On June 10, 2011, Metro sent HSB a letter claiming $600,000 plus $15,000 in attorney's fees, asserting property loss, internal labor costs associated with the chiller breakdown, and "intangible"—and unquantified—"reputation" damages.  (Docket Entry No. 79-1, at 21).  Metro listed several Texas Insurance Code provisions prohibiting untimely payment and unfair settlement practices.  The only detailed information and supporting documents Metro provided were the invoices totaling $115,077.43 for the replacement work and related internal labor costs.  (Docket Entry No. 79-1, at 19-35).  Neither Metro's letter nor invoices mentioned business-interruption losses.

HSB did not pay the $600,000 demanded because the property-loss claim and the invoices submitted showed only a covered loss of $115,077.43, less the $25,000 deductible.  HSB approved the specific losses Metro claimed and told Metro that it authorized Lexington to issue a $90,077.43 check "as full and final payment on this claim."  (*Id.*, at 36-37).  Metro took the money but stated that it was not accepted as full and final payment.  Metro still made no reference to business-interruption losses.  (*Id.*, at 191).

In September 2011, Metro sued Lexington in Texas state court, alleging wrongful denial of insurance coverage for the losses from the chiller's breakdown.  Metro still did not mention any business-interruption claim or losses.  Lexington timely removed based on diversity of citizenship.

In an initial scheduling conference held under Rule 16 of the Federal Rules of Civil Procedure, counsel for Metro stated for the first time that it was seeking business-interruption losses.

In its first amended complaint, Metro alleged that Lexington had "wrongfully denied [Metro's] claim for damages of business interruption, extra expense, and service interruption." (Docket Entry No. 20, at 2). The amended complaint alleged six claims: (1) breach of contract; (2) breach of the duty of good faith and fair dealing; (3) violation of the Texas Insurance Code's prompt-payment statutes; (4) violation of the Texas Insurance Code's unfair settlement practices statute; (5) statutory fraud in violation of the Texas Deceptive Trade Practices Act, § 17.46(b); and (6) common-law fraud. (Docket Entry No. 20).

Metro filed its expert designations after the court's deadline and without the written expert reports required by Fed. R. Civ. P. 26. Lexington moved to exclude Metro's designated experts under Fed. R. Civ. P. 37. (Docket Entry Nos. 22, 23, 24). Before the court could rule, the parties stipulated to an agreement under which Metro de-designated its damages experts. (Docket Entry Nos. 31, 32). Metro then produced its president and principal, Bob Yazdani, to testify in a deposition as its corporate representative, including on losses and damages. (Docket Entry No. 76). Yazdani's testimony was stricken after he was unresponsive and combative in his deposition. Metro then designated another employee, William Daniel Parra, as its corporate representative and as the witness to testify on damages. Parra was the hotel's Director of Human Resources during the relevant time and has since become the Executive Housekeeper.

After deposing Parra, Lexington moved for summary judgment on all of Metro's claims. Lexington argues that Parra lacks personal knowledge or other foundation necessary to testify on losses and damages, and that based on the record evidence, Metro's claims for Lexington's failure to pay a covered loss fail as a matter of law. (Docket Entry No. 78). Lexington also sought attorney's fees for a groundless suit. (*Id.*); *see also* TEX. BUS. COMM. CODE § 17.50(c); TEX. INS.

CODE § 541.153.  Metro responded, (Docket Entry No. 80), and Lexington replied, (Docket Entry

No. 82).

The arguments and responses are analyzed below under the applicable legal standards.

## II.    The Summary Judgment Standard

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute

as to any material fact" and that it "is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

"The movant bears the burden of identifying those portions of the record it believes demonstrate the

absence of a genuine[dispute] of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349

(5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of

proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'

— that is, pointing out to the district court — that there is an absence of evidence to support the

nonmoving party's case." *Celotex*, 477 U.S. at 325.  Although the party moving for summary

judgment must demonstrate the absence of a genuine dispute as to any material fact, it does not need

to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540

(5th Cir. 2005) (citation omitted).  A dispute "is material if its resolution could affect the outcome

of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks*

*Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)).  "If the moving party

fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the

nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick Cnty. Hosp. Dist.*, 308 F.3d 451,

471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(a) burden, the nonmoving party cannot survive

a summary judgment motion by resting on the mere allegations of its pleadings.  "[T]he nonmovant

must identify specific evidence in the record and articulate the manner in which that evidence

supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted).  "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a "scintilla" of evidence.'" *Little*, 37 F.3d at 1075 (citations omitted).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.   Analysis

### A.   The Policy Language

The insurance policy governing "Business Income Coverage" stated as follows:

A.   Coverage

We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your "operations" during the "period of restoration." The suspension must be caused by direct physical loss of or damage to property at the premises described [in the policy].

1.   Business Income

Business Income means the:

a.   Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and,

b.   Continuing normal operating expenses incurred, including payroll.

. . . .

D.   Loss Conditions

1.   Appraisal

If we and you disagree on the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss.

In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the amount of Net Income and operating expense Or amount of loss. If they fail to agree, they will submit their differences to the umpire.

A decision agreed to by any two will be binding. Each party will:

a. Pay its chosen appraiser; and
b. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, we will still retain our right to deny the claim.

. . . .

4.      Loss Determination

a.      The amount of Business Income loss will be determined based on:

1)      The Net Income of the business before the direct physical loss or damage occurred;

2)      The likely Net Income of the business if no loss or damage occurred;

3)      The operating expenses. Including payroll expenses, necessary to resume "operation" with the same quality of service that existed just before the direct physical loss or damage; and

4)      Other relevant sources of information, including:
        a)      Your financial records and accounting procedures;
        b)      Bills, invoices and other vouchers; and
        c)      Deeds, liens or contracts.

(Docket Entry No. 79-1, at 58, 60-61).

**B.      There Is No Competent Evidence of Business-Interruption Losses in the Summary Judgment Record**

Lexington argues that Metro did not present on summary judgment, and cannot present at trial, competent evidence of business-interruption losses or of its contractual or extracontractual damages.  Lexington argues that Metro's only witness, Parra, cannot provide lay opinion on the subject and no expert witness was timely designated; Metro's breach-of-contract and extracontractual claims fail for this and other reasons; and the court should award Lexington its reasonable attorney's fees and costs because Metro's allegations are frivolous.

        **1.**      **Whether There Is Competent Evidence About Metro's Losses and Damages**

        **a.**      **Parra's Testimony**

On May 5, 2014, this court struck Bob Yazdani, Metro's owner and CEO, as a witness but permitted Metro to present another damages witness for a deposition.  (Docket Entry No. 76).  Metro designated Daniel William Parra, its Executive Housekeeper and former Director of Human Resources, as its damages witness.  After deposing Parra, Lexington moved for summary judgment, arguing that Parra lacked the knowledge and legal basis required to testify about Metro's damages under Federal Rule of Evidence 701.  At most, Lexington argues, Parra is competent to provide testimony on lost gross revenue.  Lexington argues that because the insurance policy and Texas law both require proof of net losses—not merely lost gross revenues— to prove claimed losses under the policy and to prove damages for breaching contractual and extracontractual duties, Metro's claims fail as a matter of law.

In response to the summary judgment motion, Metro submitted Parra's deposition testimony. Parra testified that the hotel lost $181,811.86 in revenues due to no-shows and walk-outs from August 20 to November 30, 2010, when the air conditioning was off or impaired.  Some of the losses were due to food and beverage coupons given to hotel guests who stayed.  Lexington argues that

Parra lacks the knowledge or foundation necessary to give this business-interruption loss testimony under Rule 701.

Parra is neither an owner nor an officer of Metro.  When asked about the company's corporate structure, he equivocated, responding that "I guess it's a partnership, the owners of Crowne Plaza Hotel."  (Docket Entry No. 79-1, at 67).  Metro asserts that Parra "was a director of the company at the time of the loss and an executive of the company at the time of the deposition."  (Docket Entry No. 80, at 6).  The record shows that he was the Director of Human Resources from 2009 to 2012, then Executive Housekeeper.  (*See* Docket Entry No. 79-1, at 67).  But the record contains no evidence of the relevant responsibilities and training these positions involved, how Parra's roles fit into the corporate organization, or that he had access in those positions to the type of financial information at issue here.  The record is clear that Parra was not a "director" and shows that his only "executive" functions were in human resources or housekeeping.

Parra testified that as Director of Human Resources, he had no responsibilities for the hotel finances or accounting for them.  (Docket Entry No. 79-1, at 67).  He testified that he had "basic" "training in account" but no other training.  (*Id.* at 68).  Parra had never calculated business-interruption losses.  (*Id.*).  He has never been involved in calculating Metro's profits or losses, preparing balance sheets for the company, or preparing financial projections.  (*Id.*).  Parra's knowledge of the company's finances and accounting was confined to making "a spreadsheet for how much I pay people, how much I have to pay them every—every other week, something very simple" and reviewing housekeeping "purchase orders."  (*Id.* at 72).

Metro had Parra—and only Parra—testify about a spreadsheet prepared to summarize its business-interruption losses.  Parra admitted that he lacked personal knowledge about the spreadsheet or the data used to prepare it.  He did not know who prepared either, or how.  The

evidence shows that the spreadsheet was prepared using a report entitled "Financial Transaction with Generates." (Docket Entry No. 79-1, at 180-88). Parra testified that he had no information about, and "did not rely on," the report used to prepare the spreadsheet. (*Id.* at 82).

Metro's spreadsheet lists guests' names and one of three types of loss or expense: "A/C [air conditioning] amount" or "accommodation amount"; "no show amount"; and a "B/D [breakfast/drink] discount" for the coupon. (Docket Entry No. 79-1, at 196-223). Parra testified that the hotel gave out breakfast coupons to guests who complained about the lack of air conditioning. (*Id.* at 71). When asked whether any breakfast coupons "were provided to anyone for reasons that did not relate to air conditioning," Parra responded, "I do not have that knowledge." (*Id.*). When asked about how he could "determine which ones were given away for AC issues and which ones were not," Parra responded, "I guess accounting determines that." (*Id.*). When asked how they do that, Parra was unsure, responding that "I guess they keep a roster of anything about that. Have you seen some notes?" (*Id.* at 71-72).

When asked about his knowledge of the meaning of "Accommodation: 23.40" on August 15, 2010, Parra testified that he "believed" that this represented a discount from the standard room rate. (*Id.* at 71). When pressed further, Parra responded:

> I did not prepare this document [the spreadsheet]. I do not know what the person that prepared this document meant with "accommodation." During the business—the business, I guess, that accommodation has to do with a discount given to a guest.

(*Id.*).

### b.      The Rule 701 Standard

Federal Rule of Evidence 701 states:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701.[1]

Rule 701 permits a lay witness to give opinion testimony when it is "based on personal perception," one "that a normal person would form from those perceptions," and would be "helpful" to the fact finder. *Miss. Chem. Corp. v. Dresser–Rand Co.*, 287 F.3d 359, 373 (5th Cir. 2002) (citation and internal quotation marks omitted). If these criteria are met, alleged flaws in a lay-opinion witness's perception are not grounds for excluding the testimony but instead are fodder for cross-examination. *See, e.g.*, *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1199 (3d Cir. 1995) ("[T]he witness's opinion was rationally based on his personal knowledge and . . . the witness's inability to state precisely why a furnace was inoperable at a particular time was proper material for cross-examination rather than a basis for inadmissibility." (citing *Joy Mfg. Co. v. Sola*

---

[1] Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

11

*Basic Indus., Inc.*, 697 F.2d 104, 110–12 (3d Cir. 1982))); *see also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213, 1221 (11th Cir. 2003) ("[I]n *United States v. Myers*, 972 F.2d 1566, 1577 (11th Cir. 1992), . . . . the officer's testimony was rationally based on his personal perception of the victim's back and his nineteen years of experience in the police force. . . . [T]o the extent that the witness's opinion lacked a technical/medical basis, the defendant had the opportunity to expose this on cross-examination and the defendant's objections more properly went to the weight and not the admissibility of the evidence." (alterations, citations, and internal quotation marks omitted)).

"[A]n officer or employee of a corporation may testify to industry practices and pricing [under Rule 701] without qualifying as an expert [under Rule 702]." *Tex. A & M Research Found. v. Magna Transp., Inc.*, 338 F.3d 394, 403 (5th Cir. 2003) (citing *Tampa Bay*, 320 F.3d at 1223 (11th Cir. 2003)); *see also Nat'l Hispanic Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 551–52 (5th Cir. 2005) ("Rule 701 does not exclude testimony by corporate officers or business owners on matters that relate to their business affairs, such as industry practices and pricing.").

> Although Rule 701 was amended in 2000 to prohibit lay witnesses from offering opinions based on "scientific, technical or other specialized knowledge within the scope of Rule 702 [expert evidence]," . . . the amendment did not place any restrictions on the preamendment practice of allowing business owners or officers to testify based on personal knowledge obtained from their position and experience.

*Rimkus Consulting Grp. v. Cammarata*, Civ. A. No. H–07–0405, 2009 WL 1269710, at *5 n.1 (S.D. Tex. May 7, 2009) (alteration in original) (citing *Tampa Bay Shipbuilding*, 320 F.3d at 1222–23). A corporate owner or officer is competent to testify about lost profits under Rule 701 "if the witness has direct knowledge of the business accounts underlying the profit calculation." *Miss. Chem. Corp.*, 287 F.3d at 373 (allowing corporation's director of risk management to testify to lost profits);

12

*see also Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 265 (2d Cir. 1995) ("[A] president of a company . . . has personal knowledge of his business . . . sufficient to make . . . him eligible under Rule 701 to testify as to how lost profits could be calculated.") (internal citations and quotation marks omitted); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993) (allowing Rule 701 testimony by the owner of a corporation as to the amount of lost profits); *In re Merritt Logan, Inc.*, 901 F.2d 349, 359 (3d Cir. 1990) (allowing Rule 701 testimony by the principal shareholder of the plaintiff concerning that company's lost profits).

Rule 701 does not give a corporate owner or officer license to testify about all aspects of the industry or business.  An owner or highly placed executive may testify to what his broad responsibility and familiarity with the company or industry have taught him.  But if that owner or executive tries to apply general industry or business knowledge to areas or matters about which he or she lacks information or experience, that opinion cannot be admitted under Rule 701 because it is not based on personal knowledge and would instead have to be based on  specialized knowledge. Rule 701 "expressly prohibits the admission of testimony as lay witness opinion if it is based on 'specialized knowledge.'  In other words, 'a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person.'"  *Id.* (citation omitted) (quoting *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 460 (5th Cir. 1996)).

Even when a business owner or officer bases a damages or loss calculation on knowledge of that business's own accounts, the data and method used must be based on personal knowledge, usually from experience gained as an owner or officer.  *See, e.g.*, *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 930 (10th Cir. 2004) ("Instead of limiting Mr. Livingston's testimony to his experience as a businessperson and president of the company . . . LifeWise had him enter into

13

the realm of rolling averages, S-curves, and compound growth rates that appear to be an amalgam of logic, hope, and economic jargon." (alterations, citations, and internal quotation marks omitted)). Neither Rule 701 nor the cases decided under it give an employee with more limited responsibilities, experience, and information than an owner or highly placed executive officer any presumption of competence to testify about the corporation.

In *LifeWise*, a corporate president—who was not an accountant, economist, or statistician—could not testify under Rule 701 because he did not have "personal knowledge of the factors used by LifeWise's fourth damages model to estimate its lost profits," which included "technical, specialized subjects" such as "moving averages, compounded growth rates, and S-curves."  374 F.3d at 929, 930.  Under Rule 701, the president could only give a damages opinion generated "using conventional methods based on LifeWise's actual operating history."  *Id.* at 930.

Similarly, in *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion S.A. v. Titan International, Inc.*, 533 F.3d 555 (7th Cir. 2008), the Seventh Circuit applied Rule 702 rather than Rule 701 to a CEO's opinion about the value of certain collateral:

> [CEO] Taylor purported to value the collateral by applying his generalized knowledge of the worldwide tire market, gained through his experience in the worldwide tire business, to a proffered list of specific items owned by a third party.  Taylor's only connection to the items in question is the fact that he is an officer of a company that, at one time, held a controlling interest in a company that, at one time, owned the collateral. Titan, however, had no ownership interest in FUNSA[, the company that originally owned the collateral,] at the time that Taylor made his purported valuation.  Furthermore, Titan identifies no evidence that Taylor participated in FUNSA's initial purchase of the particular items in question, and his affidavit belies any contention that he based his valuation opinion on personal knowledge of the collateral.  Indeed, in his deposition, Taylor specifically disclaimed any personal knowledge of the particular items that were included in the sale.

14

*Id.* at 560.  Taylor's opinion was Rule 702 expert testimony, not Rule 701 lay opinion testimony, because the opinion "was not based on any knowledge obtained through his special relationship with the items in question.  Instead, Taylor had looked at a document from Compania listing certain collateral and estimated the value "based on his extensive experience purchasing and selling the type of goods at issue."  *Id.*  The court concluded that this was "the kind of testimony traditionally provided by an expert: '[I]t could have been offered by any individual with specialized knowledge of the [tire] market.'"  *Id.* (alterations in original) (quoting *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002)).

### c.  Parra's Testimony Is Not Admissible Under Rule 701 or Rule 702

Parra was not designated as a Rule 702 expert, and he could not have been.  He was not qualified to give testimony on matters involving the hotel's relevant internal costs, profits, or losses, or on the proper way to account for them.  Parra had no specialized knowledge about hotel finances or accounting.  If his testimony is admissible, it is only under Rule 701.

The Rule 701 issue is whether Parra has "particularized knowledge . . . by virtue of his . . . position in the business" to opine on the business-interruption losses Metro suffered as a result of the chiller malfunction.  *See* Fed. R. Evid. 701, Committee Notes to 2000 amendments.  Parra's deposition testimony shows that he does not have such knowledge.  Parra was not a company owner or highly placed executive and his jobs at the hotel had little to do with its revenues, costs, expenditures, or accounting.

Metro argues that Rule 701 "does not limit the witness to being an owner of a company" and that Parra was sufficiently involved with customers' complaints about the hotel air conditioning during the chiller malfunction to testify about the hotel's losses during that period.  (Docket Entry

15

No. 80, at 5).  The record shows that Parra had personal knowledge that the chiller malfunction caused Metro to take certain measures, specifically giving some guests food or beverage coupons. But Parra's own deposition testimony shows that he did not know information necessary to give an opinion about the amounts of the business-interruption losses the chiller malfunction caused.  Parra did not have personal knowledge about most of the steps the hotel took after the chiller breakdown, or what the costs and losses of those steps were.  He did not know the financial consequences of the steps the hotel took to respond to customer complaints or the financial consequences of the no-shows, the room-rate discounts, and other financial accommodations that were made.  He did not prepare the spreadsheet, and he did not prepare or have information about the underlying data and report.  He did not know who created the spreadsheet or the underlying data and report, why the report should be regarded as accurate, or how the hotel's net profits and losses were calculated.

Parra did know that he gave meal vouchers to some customers and the limits of what those customers could get with the vouchers.  He did not know which vouchers were given because of the chiller malfunction as opposed to other reasons.  That did not give him a basis to extrapolate to an opinion about the net losses the hotel suffered from the business interruptions the air-conditioning problem caused.

The cases Metro cites—and all but one are from other circuits—do not provide a basis for the relief it seeks.  Each case recites the uncontroversial rule that nonexpert witnesses may provide opinion testimony based on personal knowledge.  No case supports Metro's argument that Parra, who was not an owner or officer and who lacked personal knowledge of Metro's business-interruption losses from the chiller malfunction, is competent to provide lay opinion testimony on that subject.

16

Metro cites *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679 (5th Cir. 2003), in which the Fifth Circuit reversed an $8 million jury verdict because the lower court had "erroneously admitted [lay] opinion testimony" on DIJO's lost profits from a failed hotel-development deal.  The witness, a financial consultant, "had little significant knowledge about DIJO and its operations."  *Id.* at 685.  The court stated that:

> [b]ased on his own admissions on the stand, [the witness] simply did not have the requisite first-hand, personal knowledge about DIJO and the Project necessary to qualify as a Rule 701 opinion witness. His opinion about what the Project "could" generate was based on preliminary income figures and other information that he had received. . . . [He] performed his own appraisal, but nothing in the record indicates that this was based on his own independent knowledge or observations.

*Id.* at 686.  "Given [the witness's] total lack of direct and particularized knowledge about DIJO," the Fifth Circuit concluded, "this was not a close evidentiary call."  *Id.*   While Parra had more day-to-day knowledge than the witness in *DIJO,* the case does not support Metro's argument that Parra's employment as Executive Housekeeper and Director of Human Resources gave him the personal knowledge about the company's expenses and losses from the chiller malfunction necessary to make his testimony admissible under Rule 701.

Similarly, in *Consolidated Rail Corp. v. Grand Trunk Western R. Co.*, 963 F. Supp. 2d 722 (E.D. Mich. 2013), the court allowed two railway executives to testify about their companies' lost profits from an alleged contract breach that prevented them from shipping freight across certain property.  Unlike Parra, both witnesses were corporate officers.  One testified that he had been a group-vice president for metals and construction for years, managed a staff of 30 sales and marketing professionals, and had been involved in preparing the damages calculations.  *Id.* at 733. The other had worked for the railway company for years and testified that one of the sales people who prepared the company's damages calculation worked for him.  *Id.*  The court concluded that

17

both witnesses "had the threshold knowledge and ability to testify as to the damages their companies suffered."  *Id.* at 733.  Here, by contrast, Parra's personal knowledge was limited to responding to some of the customer complaints.  Unlike the corporate officers in *Grand Trunk*, his job did not involve him in the corporate activities he was testifying about; he had played no role in preparing the damages calculation or supervising its preparation; and he did not know who collected the underlying data and report or who prepared the spreadsheet and how.

In *Thermodyne Food Service Products, Inc. v. McDonald's Corp.*, 940 F. Supp. 1300 (N.D. Ill. 1996), the court allowed both a company's CEO and product manager to testify about what kinds of steps had to be taken to keep secret information that the company claimed was entitled to protection as a trade secret.  The court emphasized that the testimony did not require the same level of quantitative precision as damages opinion testimony.  *See id.* at 1306.  In *Builders Steel Co. v. Commissioner of Internal Revenue*, 179 F.2d 377 (8th Cir. 1950), the court allowed corporate officers and outside contractors and architects to testify about the value of the professional services those officers provided the company.  *See id.* at 379-80.  By contrast, Parra is not testifying about the value of his work as Metro's executive housekeeper or as director of human resources. *Cf. Flores v. City of San Gabriel*, 99 F. Supp. 2d 1158, 1165 (C.D. Cal. 2013) ("Given her position as the Human Resources Director and the top manager in the Human Resources Office, Ms. Marlowe would have known of any issues or complaints regarding the regular [compensation] rate calculation. Therefore, Ms. Marlowe's opinion qualifies as a lay opinion." (citation omitted)).  Nor is he testifying about general procedures or steps.  Instead, his testimony is about business-interruption damages, and he does purport to be quantitatively precise in a way neither his experience nor position justifies.

18

Metro also cites *International Rental and Leasing Corp. v. McClean*, 303 F. Supp. 2d 573 (D. V.I. 2004). In that case, the court concluded that a witness had "knowledge to give estimates on the cost of repairing his company's vehicle" under Rule 701 because he was "licensed in automobile repair, [wa]s the general manager of a business that regularly makes decisions on the costs of repairing vehicles, and personally viewed the damaged vehicle." *Id.* at 578. Here, by contrast, Parra's role as Executive Housekeeper and Director of Human Resources had nothing to do with the hotel's overall finances, profits, and losses. His roles did not require him to keep track of, or account for, business losses. His personal knowledge of the business losses from the chiller breakdown was limited to his personal experience trying to assuage some of the guests by giving them food and beverage vouchers. Parra had no personal knowledge of most of the hotel's business expenses or losses from the chiller breakdown or of the total loss amount.

Metro argues that "Parra's testimony and opinions are not based on future lost profits, but on what the hotel *actually spent* to accommodate its guests." (Docket Entry No. 80, at 6). But Parra did not have personal knowledge of the hotel's total costs spent or losses incurred trying to accommodate guests when the air conditioning malfunctioned. The policy specifies that business-interruption losses are to be calculated using the business's net income before the direct physical loss; the net income if no loss or damage occurred; plus the operating expenses, including payroll expenses, necessary to resume "operation" with the same quality that existed just before the direct physical loss or damage; and other information, including financial records and accounting procedures, bills, invoices and other vouchers, and deeds, liens or contracts. (Docket Entry No. 79-1, at 58, 60-61). As discussed above, Parra's personal knowledge is limited. The policy requires that Parra's damages testimony be based on information well beyond those limits—information about which he concedes he has no personal knowledge.

19

Parra may not provide lay opinion under Fed. R. Evid. 701 on Metro's business-interruption losses or damages.

## 2.    No Other Competent Record Evidence Shows the Amount of Business-Interruption Losses

Metro argues that even if Parra's testimony is not competent to prove business-interruption losses and damages, Lexington's own witnesses "recognize that the hotel suffered a business loss." (Docket Entry No. 80, at 7).  Metro relies on an unsworn report prepared by Lexington's forensic accountants entitled "Crowne Plaza Houston—Medical Center: Business Income Loss."  (Docket Entry No. 80-4).  The report refers to at most $27,019.69 in business-interruption losses as a result of the chiller breakdown.  As an initial matter, this is far less than Metro's assertions that it suffered $181,811.86 in business-interruption losses.  (*Id.* at 3-4).  And the $27,019.69 is based on Metro's own spreadsheet and the "Financial Transactions with Generates" report used to prepare it.  (Docket Entry No. 80-4, at 3-4; *see also* Docket Entry No. 79-1, at 180-88).  Parra admitted that he had not prepared the report, or a document like it, and had not used the report in working for Metro or otherwise.  (Docket Entry No. 79-1, at 72, 82).  He testified that he "did not rely on th[e] document" and had no information about it.  (*Id.* at 82).

The spreadsheet and related documents lack the foundation necessary for competent summary-judgment evidence.  Parra lacked adequate knowledge of the spreadsheet and underlying data to establish the predicate for their admission.  *See Hoffman v. Applicators Sales and Service, Inc.*, 439 F.3d 9, 16 (1st Cir. 2006) (affirming the district court's summary-judgment grant based on the lack of competent evidence, because the affiant made "no mention of how he came to have personal knowledge of the facts contained in Exhibit E, nor d[id] he affirm in the affidavit that he would be able to testify to the facts contained in Exhibit E at trial," and "[t]he chart he attached to

his offer of proof is not authenticated in any way, nor, as already discussed at length above, did he identify the source of the facts and figures listed in the chart beyond reference to Bates-numbered pages from discovery documents not attached to the chart."); *Carmona v. Toledo*, 215 F.3d 124, 131 (1st Cir. 2000) ("Documents supporting or opposing summary judgment must be properly authenticated."); *Galderma Labs, LP v. Paddock Labs, Inc.*, No. 4:09-cv-002-Y, 2011 WL 1119700, at *3 (N.D. Tex. 2011) ("Without an assurance from Fleming that he has sufficient knowledge to personally attest to the reliability of the evidence in the appendices, his declaration is insufficient to authenticate that evidence.").

In addition to Parra's lack of knowledge, Metro did not provide an affidavit to support the spreadsheet and underlying data's admissibility as summary-judgment evidence. 10A FED. PRAC. & PROC. CIV. § 2722 (3d ed.) ("To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through whom the exhibits could be admitted into evidence." (footnote omitted)). Lexington's forensic accountants' report sought to rebut Metro's spreadsheet and underlying data. (Docket Entry No. 80-4, at 1-37). In doing so, Lexington's experts assumed that the evidence was in the record and properly considered. Their unsworn expert report does not establish the predicate to make what it sought to rebut independently admissible as competent summary-judgment evidence. *See Provident Life & Acc. Ins. Co. v. Goel*, 274 F.3d 984, 1000 (5th Cir. 2001) ("Unsworn expert reports . . . do not qualify as affidavits or otherwise admissible evidence for [the] purpose of Rule 56, and may be disregarded by the court when ruling on a motion for summary judgment." (quotation omitted)).[2]

---

[2] In requesting attorney's fees, Lexington submitted by affidavit the "spreadsheet produced by [Metro] in support of its purported damages" and "correspondence exchanged" during the lawsuit that included the "Financial Transactions with Generates" report. (Docket Entry No. 79-1, at 89). But this does not by itself make the documents admissible to prove business-interruption losses or damages absent further knowledge of how the documents were prepared or their underlying data.

Nor is the Lexington report, the Metro spreadsheet, or the underlying report, a record of regularly conducted activity or a summary of independently admissible documents, given Parra's lack of personal knowledge.  Although Parra testified that he prepared spreadsheets as Director of Human Resources showing "how much [he] pay[s] people," he admitted that he had not prepared a document like the underlying report, that he did not know who prepared the spreadsheet or how, and that his accounting experience was limited to his human resources position.  (Docket Entry No. 79-1, at 72).  His testimony fails to demonstrate that he was a "custodian or another qualified witness" who could establish the elements of Rule 803(6) (regularly conducted activity) or Fed. R. Evid. 1006 (allowing summaries to prove content).  *See Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004) ("Rule 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible.").

Metro has not pointed to other summary judgment evidence to prove its business-interruption damages.  The evidence in the summary judgment record does not support or provide a showing of business-interruption losses or damages.

### C.     There is No Summary Judgment Evidence on Necessary Elements of Metro's Breach of Contract Claim

Under Texas law, insurance contracts are subject to the same construction rules as other contracts. *Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.*, 322 F.3d 847, 853 (5th Cir. 2003); *St. Paul Guardian Ins. Co. v. Centrum GS Ltd.*, 283 F.3d 709, 713 (5th Cir. 2002); *State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995).  The courts are to give effect to the written expression of the parties' intent. *Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d

---

*See Galderma Labs, LP v. Paddock Labs, Inc.*, No. 4:09-cv-002-Y, 2011 WL 1119700, at *3 (N.D. Tex. 2011) ("Without an assurance from Fleming that he has sufficient knowledge to personally attest to the reliability of the evidence in the appendices, his declaration is insufficient to authenticate that evidence.").

198, 201 (Tex. 2004); *Beaston*, 907 S.W.2d at 433.  All parts of the contract must be read together. *Utica*, 141 S.W.3d at 201; *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998). If the policy is not ambiguous, "courts must give the words their plain, ordinary and generally accepted meaning unless the policy shows that the words were meant in a technical or different sense." *Fed. Deposit Ins. Corp. v. Firemen's Ins. Co. of Newark, N.J.*, 109 F.3d 1084, 1087 (5th Cir. 1997). In this case, the parties do not assert ambiguity.

In a case claiming breach of an insurance contract, the plaintiff must show coverage, that the contract was breached, that the insured was damaged by the breach, and the amount of resulting damages. *Block v. Employers Cas. Co.*, 723 S.W.2d 173, 178 (Tex. App.-San Antonio 1986), *aff'd*, 744 S.W.2d 940 (Tex.1988).  The insured has the burden to plead and prove that the insurance policy covers the benefits sought. *Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 (5th Cir. 2001); *W. Alliance Ins. Co. v. N. Ins. Co.*, 176 F.3d 825, 831 (5th Cir. 1999).  Because Parra may not testify about the hotel's business-interruption losses or damages under the policy, and Metro does not have another witness or documents to provide this evidence, Metro cannot prove a necessary element of its breach-of-contract claim.

Metro argues that a "fact issue clearly exists whether HSB was required to ask its insured whether or not they needed to make a business loss claim[] when it was reported to HSB that customers had walked out of the hotel because the AC was not working properly."  (Docket Entry No. 80, at 2).  A mention in the telephone call first reporting the property-loss claim that some customers had cancelled reservations and Metro was concerned about a major upcoming event does not equate to a timely claim as a result of covered business-interruption loss.  Nor does such a fleeting mention provide evidence of the loss amounts.  Those loss amounts are the only damages Metro asserts for the breach of contract it alleges.  Without this evidence, Metro cannot establish

23

a necessary element of its breach-of-contract claim. Lexington's motion for summary judgment on this claim is granted.[3]

### D.   There is No Summary Judgment Evidence on Necessary Elements of Metro's Extracontractual Claims

#### 1.   The Claim for Breach of the Duty of Good Faith and Fair Dealing

Texas law imposes on insurers "a common law duty to deal fairly and in good faith with its insured in the processing and payment of claims." *Aleman v. Zenith Ins. Co.*, 343 S.W.3d 817, 822 (Tex. App.—El Paso 2011, no pet.) (citing *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995)). "An insurer will be liable if [it] denies a claim when the insurer knew or should have known that it was reasonably clear that the claim was covered." *Id.* "An insurer may also breach its duty of good faith and fair dealing by failing to reasonably investigate a claim." *Id.* "The issue of the breach of the duty of good faith and fair dealing 'focuses not on whether the claim was valid, but on the reasonableness of the insurer's conduct' in handling the claim." *Id.* (citation omitted). "An objective standard is utilized to determine whether a reasonable insurer under similar circumstances would have delayed or denied payment of the claim." *Id.* "As long as the insurer has a reasonable basis to deny or delay payment of a claim, even if that basis is eventually determined by the fact finder to be erroneous, the insurer is not liable for the tort of bad faith." *Higginbotham*, 103 F.3d at 459 (citing *Lyons*, 866 S.W.2d at 600).

Metro argues that a "fact issue clearly exists whether HSB was required to ask its insured whether or not they needed to make a business loss claim[] when it was reported to HSB that

---

[3]   Metro did not submit a claim for business-interruption losses before it filed suit. Lexington's "determination that [Metro] may have suffered business interruption is now subject to the policy's provisions requiring the parties to reach an agreement on the amount, or go to appraisal." (Docket Entry No. 82, at 4-5; *see also* Docket Entry No. 79-1 at 62, ¶ 5). Metro does not address this issue.

24

customers had walked out of the hotel because the AC was not working properly." (Docket Entry No. 80, at 2). But Metro does not identify how the duty of good faith and fair dealing required Lexington to initiate the subject of business-interruption losses when Metro said nothing about it after an early and brief reference, and the only specific claim Metro did submit made no mention of any business-interruption losses. Lexington repeatedly pushed Metro to submit specific information about its losses. When Metro finally did so after a nine-month delay, the specifics were limited to costs for replacing the chiller. Lexington paid the amounts promptly.

The evidence shows that Metro's only reference to business-interruption losses was in a brief conversation first reporting the chiller breakdown and mentioning some customer no-shows and concerns about an upcoming event. This conversation was in the first telephone report on the chiller breakdown. This early, and brief, reference was inadequate to trigger a duty to initiate later inquiries into whether Metro intended to submit a claim for business-interruption loss.

It is undisputed that Metro made no claim for business-interruption loss as a result of the chiller until some time after this litigation began. Metro has not pointed to summary-judgment evidence that supports a reasonable inference that Lexington breached a duty of good faith and fair dealing by not initiating an investigation to whether Metro had any such claim, when Metro did not identify, much less claim, such losses. This cause of action fails as a matter of law.

### 2.     The Statutory Prompt-Payment Claims

The Texas prompt-payment statute "provides for additional damages when an insurer wrongfully refuses or delays payment of a claim." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 16 (Tex. 2007). An insurer "who is 'liable for a claim under an insurance policy' and who does not promptly respond to, or pay, the claim as the statute requires, is liable to the policy holder or beneficiary not only for the amount of the claim, but also for 'interest on the amount of

the claim at the rate of eighteen percent a year as damages, together with reasonable attorney's fees.'" *Id.* (quoting TEX. INS. CODE § 542.060(a)). If a suit is filed, the plaintiff is also eligible to recover attorney fees. TEX. INS. CODE § 542.060(b). "To recover a statutory penalty under [the prompt-payment statute], an insured must establish: (1) a claim under an insurance policy; (2) that the insurer is liable for the claim; and (3) that the insurer has failed to comply with one of the requirements of [the statute] with respect to the claim." *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 678 (Tex. App.—Austin 2003, no pet.); *see also Harris v. Am. Prot. Ins. Co.*, 158 S.W.3d 614, 623 (Tex. App.—Fort Worth 2005, no pet.) ("An insurer will not be held liable for violating [the prompt-payment statute] unless it is found liable for the underlying insurance claim.").

Within 15 days of receiving notice of a claim, an insurer must acknowledge receipt of the claim, begin an investigation, and ask the claimant for "all items, statements, and forms that the insurer reasonably believes, at that time, will be required from the claimant." TEX. INS. CODE § 542.055(a). An insurer must also inform the claimant within 15 business days after receiving "all items, statements, and forms required by the insurer to secure final proof of loss" whether it accepts or rejects the a claim. TEX. INS. CODE § 542.056(a). An insurer rejecting a claim must state the reasons. TEX. INS. CODE § 542.056(c). An insurer approving all or part of a claim must pay no later than 5 business days after notifying the claimant. TEX. INS. CODE § 542.057(a). An insurer may condition payment on "the performance of an act by the claimant." TEX. INS. CODE § 542.057(b). An insurer may not otherwise delay paying a claim for more than 60 days after receiving "all items, statements, and forms reasonably requested and required." TEX. INS. CODE § 542.058.

Metro alleged that Lexington violated the prompt-payment statutes by: (a) failing to timely "acknowledge receipt of the claim," "commence any investigation of the claim," and "request from

[Metro] all items, statements, and forms that the insurer reasonably believes, at that time, will be required," Tex. Ins. Code § 542.055(a)(1-3); (b) failing to timely accept or deny Metro's full and entire claim within the statutorily mandated time of receiving all necessary information, *see id.* § 542.056; and (c) "delay[ing] payment of the claim" beyond the deadline, *id.* § 542.058.

Lexington received notice of the claim on Monday, August 23, 2010. (Docket Entry No. 79-1, at 6). The company spoke with Metro's principal the next day. Through HSB, Lexington accepted the claim on Friday, September 3, 2010, 11 calendar days after the first notice of loss. (*Id.* at 11-12). Despite Lexington's repeated requests for information necessary to determine the amount and pay the claim, Metro did not respond until June 2011, when it sent Lexington a demand for $600,000, plus $15,000 in attorney's fees. Metro's failure to provide the requested invoices until several months later prevented Lexington from paying the hotel's claim sooner. Once Metro did finally submit the requested invoices, Lexington immediately notified Metro that it would pay $90,077.43, the amount accounted for in the replacement invoices and for labor costs, minus the policy deductible. The record shows no payment delay that triggers the statutory penalty.

Metro asserts there was a delay in payment for its business-interruption loss claim, but Metro never submitted a business-interruption loss claim before bringing this lawsuit. Metro demanded nearly $600,000 when it submitted the property-loss invoices for replacing the chiller, but Metro said nothing about business-interruption losses in the demand letter and submitted nothing to support any amount above the invoices. *See Devonshire Real Estate & Asset Mgmt., LP v. Am. Ins. Co.*, No. 3:12–CV–2199–B, 2014 WL 4796967, at *19 (N.D. Tex. Sept. 26, 2014) (requiring that the insured "show that . . . it made a claim under an insurance policy"); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 19 (Tex. 2007) ("The prompt-payment statute . . . requires that the insured *submit a written notice of claim which then triggers the insurer's duties to investigate* and

27

acknowledge the claim." (emphasis added)).  Instead, Metro cited provisions of the Texas Insurance Code, many of which provide for treble damages.  (Docket Entry No. 80, at 33).  It was reasonable for Lexington to interpret the citation to the prompt-payment statute as referring to delay in paying the property-losses claimed because these were specific losses Metro identified and supported.  Only after Metro brought suit and received significant prodding from the court and the defendant did it assert a business-interruption claim or produce any documents in support.

Metro's prompt-payment claims under §§ 542.055(a), 542.056, and 542.058 fail as a matter of law on the present record.

### 3.    The Statutory Unfair Settlement Practices Claims

Metro alleges that Lexington violated § 541.060 of the Texas Insurance Code, which prohibits certain unfair settlement practices.  "A person who sustains actual damages may bring an action against another person for those damages caused by the other person engaging in an act or practice" prohibited under § 541.060.  TEX. INS. CODE § 541.151.  A prevailing plaintiff may recover actual damages, court costs, and reasonable and necessary attorneys' fees.  TEX. INS. CODE § 541.152(a)(1).  If the trier of fact finds that a defendant knowingly committed an unfair settlement practice, "the trier of fact may award an amount not to exceed three times the amount of actual damage."  TEX. INS. CODE § 541.152(c).

Metro alleges the following unfair settlement practices:  (a) "misrepresenting to a claimant a material fact or policy provision relating to coverage at issue," § 541.060(a)(1); (b) "failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability is reasonably clear," TEX. INS. CODE § 541.060(a)(2)(A); (c) "failing to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim or offer of a compromise settlement

28

of a claim," *id.* § 541.060(a)(3); (d) "failing within a reasonable time to affirm or deny coverage of a claim," *id.* § 541.060(a)(4)(A); and (e) "refusing to pay a claim without conducting a reasonable investigation with respect to the claim," *id.* § 541.060(a)(7).   These claims rest on conclusory allegations.   They fail as a matter of law on the undisputed summary judgment record.

Metro asserts a misrepresentation claim under § 541.060(a)(1), but its amended complaint does not allege a specific affirmative misrepresentation.   Instead, the misrepresentation alleged was an omission—Lexington's failure to ask about whether there were business-interruption losses to be claimed.    Parra, Metro's corporate representative and sole witness, testified that the misrepresentation was in failing to "ask [about] or mitigate [business interruption damage] . . . promised to be covered to me when I buy the policy."   (Docket Entry No. 79-1, at 75-76).   But, as the court has found, Lexington was under no contractual or extracontractual duty to raise the subject when Metro said nothing about it after a brief mention in late August 2010.   There is no evidence in the record that supports an inference of misrepresentation as alleged.   Parra never spoke with Lexington or HSB about the chiller malfunction.   (*Id.*, at 69).   Metro has not pointed to evidence in the record that would allow a reasonable factfinder to conclude that Lexington made either an affirmative misrepresentation or a misrepresentation by omission.

Metro's remaining § 541.060 claims seek damages for Lexington's alleged unreasonableness in settling, investigating, denying, or paying the claim.   Lexington accepted the property losses from the chiller malfunction 11 days after receiving notice of the loss.   (Docket Entry No. 79-1, at 11-12).   Lexington unsuccessfully sought information and documents that would show the loss amount for months.   When Metro finally submitted invoices supporting a property-damage claim, Lexington promptly paid them, less the deductible.   (*Id.*, at 36-39).   During this time and despite a number of communications, Metro made no reference to, or claim for, business-interruption losses under the

policy.  Because Metro never presented a business-interruption claim, it cannot show that Lexington refused to pay this claim without reasonable investigation, failed to explain its denial, or delayed in affirming or denying the claim.

### 4.    The Deceptive Trade Practices Act

"A person who sustains actual damages may bring an action against another person for those damages caused by the other person engaging in an act or practice . . . specifically enumerated in Section 17.46(b), Business & Commerce Code, as an unlawful deceptive trade practice if the person bringing the action shows that the person relied on the act or practice to the person's detriment." TEX. INS. CODE § 541.151. Metro alleges the following "false, misleading, or deceptive acts or practices" that violated the Deceptive Trade Practices Act, TEX. BUS. COMM. CODE § 17.46(b)[4]: "representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law," TEX. BUS. COMM. CODE § 17.46(b)(12); "misrepresenting the authority of a salesman, representative or agent to negotiate the final terms of a consumer transaction," *id.* § 17.46(b)(14); "representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve," *id.* § 17.46(b)(20); and "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction which the consumer would not have entered had the information been disclosed," *id.* § 17.46(b)(24).

---

[4] In *Crown Life Ins.*, 22 S.W.3d 378, the Texas Supreme Court found that while "only a 'consumer' may maintain a cause of action directly under the DTPA," id. at 386, "[l]ack of consumer status ... [did] not bar [the plaintiff] from bringing a cause of action under [the former] Article 21.21 [of the Texas Insurance Code]," *id.* at 387. A provision in the former Article 21.21 of the Texas Insurance Code "incorporate[d] the DTPA laundry list of deceptive acts [but did] not incorporate the entire DTPA." *Id.* at 386.

Metro's amended complaint fails to allege any facts that, if proven, could give rise to a reasonable inference of a DPTA violation.  Nor has Metro pointed to summary judgment evidence from which a reasonable jury could find in its favor on these claims.  Metro's DPTA claims fail as a matter of law on the summary judgment record.

### 5. Common-Law Fraud

Metro alleges that Lexington made fraudulent representations on which Metro detrimentally relied.  Putting aside the fact that the allegations in the amended complaint fail to satisfy Rule 12(b), much less Rule 9(b), Metro has not pointed to evidence in support of this claim from which a reasonable jury could find Lexington liable.  The fraud claim fails on the summary judgment record.

### D. Lexington's Request for Attorney's Fees

Lexington moved for $68,901.00 to $72,410.00 in attorney's fees under TEX. BUS. & COMM. CODE § 17.50(c) and TEX. INS. CODE § 541.153.  These statutes allow a court to award reasonable fees and costs if the suit under either subchapter is "groundless," in "bad faith," or "for the purpose of harrassment."  *See* Tex. Bus. & Comm. Code § 17.50(c) ("On a finding by the court that an action under this section was groundless in fact or law or brought in bad faith, or brought for the purpose of harassment, the court shall award to the defendant reasonable and necessary attorneys' fees and court costs."); TEX. INS. CODE § 541.153 ("A court shall award to the defendant court costs and reasonable and necessary attorney's fees if the court finds that an action under this subchapter is groundless and brought in bad faith or brought for the purpose of harassment.").

The term "groundless" in section 17.50 of the Texas Business and Commerce Code "has the same meaning as 'groundless' under Rule 13 of the Texas Rules of Civil Procedure."  *Donwerth v. Preston II Chrysler–Dodge, Inc.*, 775 S.W.2d 634, 637 (Tex. 1989).  An action is "groundless" if it "has no basis in law or fact, and is not warranted by any good faith argument for extension,

31

modification, or reversal of existing law." *Id.* at 637 (citing TEX. R. CIV. P. 13).   A court must consider whether "the totality of the tendered evidence demonstrates an arguable basis in fact and law for the [plaintiff's] claim." *Splettstosser v. Myer*, 779 S.W.2d 806, 808 (1989).   A suit is brought in bad faith if it is "motivated by malicious or discriminatory purpose." *Riddick v. Quail Harbor Condominium Ass'n, Inc.,* 7 S.W.3d 663, 677 (Tex.App.-Houston [14th Dist.] 1999, no pet.).

Lexington has not met its burden to show that it is entitled to attorney's fees under the statutes it invokes.   Although Metro has not offered a witness that can provide Rule 701 testimony on losses and damages, its claims were not so lacking in law or fact as to be "groundless."   The court denies Lexington's request for attorney's fees.

## V.   Conclusion

Lexington's motion for summary judgment, (Docket Entry No. 78), is granted.   Its request for an award of attorney's fees and costs is denied.   Final judgment is entered by separate order.

SIGNED on January 29, 2015, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

32